IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge R. Brooke Jackson

Civil Action No 15-cv-01337-RBJ

SYNERGY RESOURCES CORPORATION, a Colorado corporation,

    Plaintiff/Counterclaim Defendant,

and

EDWARD HOLLOWAY, an individual, and
CRAIG D. RASMUSON, an individual,

    Counterclaim Defendants,

v.

BRILLER, INC., Nebraska corporation,
R.W.L. ENTERPRISES, and
ROBERT W. LOVELESS,

    Defendants/Counterclaim Plaintiffs,

---

ORDER on MOTIONS TO DISMISS

---

This order addresses two motions to dismiss, one filed by the defendants and the other filed by the two individuals named by defendant Briller as defendants to its counterclaims. ECF Nos. 36 and 47. A third dispositive motion, ECF No. 63, just became ripe and will be addressed in a later order.

**BACKGROUND**

In 1993 Briller, Inc., a Nevada corporation with its principal place of business in California, acquired two oil and gas leases on land in Weld County, Colorado. The parties refer

1

to the leases as the 1982 and 1985 leases.  The 1982 lease had a primary term of three years and as long thereafter as oil or gas continued to be produced from the leased land or lands with which the leased land is consolidated.  It further provided that even if production ceased after the primary term, "this lease shall not terminate provided lessee resumes operations for re-working or drilling a well within sixty (60) days from such cessation."  ECF No. 27-1 at ¶¶2, 12.  The 1985 lease had a primary term of 10 years and as long thereafter as oil or gas continued to be produced from the leased land or acreage pooled with the leased land.  It had a cessation of production clause similar to that in the 1982 lease except that the lease would not terminate if the lessee commenced additional drilling or re-working operations within 90 days.  ECF No. 27-2 at ¶1.

Based on its review of Briller's records in the public file at the Colorado Oil & Gas Commission the plaintiff, Synergy Resources Corporation, determined that both leases appeared to have terminated under their respective cessation of production clauses.  Synergy alleges that between August 2014 and April 2015 it provided Briller and Briller's owner, Robert W. Loveless, several notices of its position that the leases had terminated.  Beginning in August 2014 Synergy also requested that Briller provide production records documenting production sufficient to prevent the termination of the two leases, if such production had occurred, but that Briller did not provide the requested documentation.  In September 2014 Synergy obtained leasehold interests from the individuals and entities that it believed did own the mineral interests and began operations for the exploration and development of oil and gas by drilling eight horizontal wells that crossed through the lands that had been subject to the Briller leases.

The dispute arises from Briller's contention that notwithstanding what the Commission's public records might have shown, there was in fact production from the Greeley Tech Center #41-5 Well that prevented its leases from expiring, and the production was reported to the Commission. Synergy filed this lawsuit in the Weld County District Court on June 1, 2015 seeking a declaratory judgment as to whether the 1982 and 1985 Briller leases expired by their terms (and a second claim seeking damages caused by defendants' alleged interference with Synergy's contracts with the mineral owners from whom Synergy obtained leases). Verified Complaint, ECF No. 11. Defendants removed the case to this Court on the basis of diversity of citizenship jurisdiction. ECF No. 1. Defendants then filed an answer, and defendant Briller added counterclaims against Synergy and two of its principals, Edward Holloway and Craig D. Rasmuson. ECF No. 10. The counterclaims asserted trespass, bad faith trespass and conversion and sought damages and injunctive relief. Briller sought both monetary and injunctive relief. ECF No. 10. Later, after Synergy filed an Amended Complaint, Briller expanded its counterclaims to add a claim for civil theft. ECF No. 37 at 66.

When I met with counsel on October 30, 2015 for an initial scheduling conference the parties agreed that the first step would be to resolve whether the two Briller leases had expired due to cessation of production. Briller was about to produce its production records, but Synergy apparently was skeptical about the bona fides of those records. The parties agreed, however, that the answer could be found in the records of a third party, DCP Midstream, that purchased the production from the Greeley Tech Center #41-5 Well. Counsel suggested that they could probably resolve the dispute about the validity of the Briller leases once they obtained the DCP

Midstream records. The records have been obtained, but the anticipated resolution of the lease expiration issue did not occur.[1]

## MOTIONS TO DISMISS

### A. Defendants' Motion to Dismiss, ECF No. 36.

This motion has the lengthy title, "Objection that Plaintiff is Not the Real Party in Interest to Determine Lease Validity. Motion to Dismiss Amended Complaint for Failure to Join Necessary Parties, Motion to Realign Necessary Parties as Plaintiffs, and Motion to Dismiss Amended Complaint for Failure to State a Claim Upon Which Relief Can be Granted." The motion is not as complicated as the title, but before addressing it, some additional background is necessary.

1. Facts.

The original lessors of the 1982 and the 1985 leases were six gentlemen doing business as the Greeley Tech Center joint venture. The original lessee of the 1982 lease was an individual named Thomas H. Morgan. The original lessee of the 1985 lease was a company, Rival Drilling, Inc. The leases were later assigned to Mr. Loveless or his proprietorship, R.W.L. Enterprises and reassigned to Briller as the lessee.

---

[1] During a telephone hearing concerning a discovery dispute on January 22, 2016 counsel reported that DCP Midstream completed its response to plaintiff's subpoena on December 17, 2015. Defense counsel indicated that the documents verified Briller's position that production had occurred during the period in which Synergy had claimed that there was no production. However, the records also revealed a period of something like 167 days in 1985 or 1986 when there was no production. Therefore, Briller now took the position that its 1982 lease expired in 1985 or 1986, causing the 1985 top lease to become the operable lease. Counsel added that the DCP Mainstream records also revealed a 90-day period of non-production in 2004, allegedly just under the wire of what would cause the 1985 lease to expire. All of this is apparently the subject of Briller's cross-motion for summary judgment which the Court has not yet addressed.

The ownership of the property also evolved over time. Greeley Tech Center apparently sold its interest in the property, including mineral rights, to a developer called Ciera Dawn, LLC. It appears that Ciera Dawn then developed the property.[2] Apparently there are some 44 private homes, a golf course, and perhaps other improvements on the property today. As I understand it, Briller has continued to make royalty payments to Ciera Dawn. I am not aware whether Ciera Dawn has passed the royalties through to the present owners.

In any event, when Synergy became convinced that the 1982 and 1985 leases had expired, it contacted most if not all of the present owners and attempted to obtain leases from each of them. Exhibit C to Synergy's Amended Complaint, ECF No. 27-3, is a chart listing the homeowners and others from whom Synergy had obtained leases when the chart was prepared. It lists leases dated September 1, 2014 from 42 lessors, nearly all of whom appear to be homeowners. In addition, the chart shows two leases from Ciara Dawn, LLC dated September 12, 2014.

2. <u>Conclusions</u>.

In the pending motion defendants argue that Synergy is not the real party in interest because it is not a party to the 1982 and 1985 leases and has no right to seek damages from the defendants for their alleged failure to pay royalties to the 44 homeowners (and anyone else who owns mineral interests in the Subject Lands). ECF No. 36 at 5-6. However, Synergy is not attempting to seek damages based on failure to pay royalties. The Amended Complaint does allege, "on information and belief," that defendants failed to fulfill their royalty payment

---

[2] The parties appear to refer to "the Lands" and the "Subject Lands" to mean the lands covered by the 1982 and 1985 leases within Section 5, Township 5 North, Range 66 West, 6th P.M., Weld County, Colorado.

obligations under the leases, but this appears to have been asserted as additional evidence that the leases were no longer valid. *See* ECF No. 27 at ¶¶ 36-38.

Nor do I agree with defendants that these mineral owners are necessary parties. The issue posed by Synergy is whether the two leases have expired by their own terms. Synergy obviously has an interest in that question. If the leases expired, then it had the right to enter into leases with the mineral owners. It has done so, and the mineral owners stand to benefit from royalties paid by Synergy. If either of the leases has not expired, then Synergy's claim fails, and its leases from the mineral owners are presumably void. In that event, if the mineral owners' are entitled to royalties from Briller or Ciara Dawn that they have not received, they can take such action as they deem appropriate. If defendants are sincerely concerned about some prejudice to them from the absence of these parties, it can attempt to join them. The Court holds that Synergy has no obligation to do so.

### B. Holloway/Rasmuson's Motion to Dismiss, ECF No. 47.

1. Facts.

Some additional background specific to this motion is necessary, and for this purpose I will assume the truth of Briller's well-pleaded factual allegations. In response to Synergy's Amended Complaint, Briller counterclaimed, asserting claims of trespass, bad faith trespass, and conversion of hydrocarbons. ECF No. 37 at 40-69. It also joined two individuals, Edward Holloway and Craig D. Rasmuson, as defendants to its counterclaims, asserting that they "were and still are owners, officers, directors and/or employees of both Petroleum Management, LLC and Synergy." *Id.* at ¶11 (paragraph numbers refer to the paragraphs of the counterclaim). Mr.

Holloway is said to be Synergy's President and Co-Chief Executive Officer. *Id.* at ¶14. Mr. Rasmuson is said to be Synergy's Chief Operating Officer. *Id.* at ¶15.

Specifically, Briller alleges that in early to mid-2008 Mr. Holloway, then and still with Petroleum Management, LLC, periodically contacted Briller's principal and president, Mr. Loveless, to discuss potential oil and gas operations that would involve the GTC Lease. *Id.* at ¶12. In September and October 2008 Mr. Rasmuson, the Manager of Land and Field Operations for Petroleum Management, LLC, notified RWL Enterprises (Mr. Loveless's proprietorship) of its intent to create a drilling and spacing unit including the Subject Lands. *Id.* at ¶¶17-18. After RWL Enterprises objected, Mr. Rasmuson withdrew the proposals. *Id.* at ¶¶19-20. But Mr. Holloway and Mr. Rasmuson continued to contact Briller from time to time through 2010 to discuss potential oil and gas operations involving the GTC Lease. *Id.* at ¶21.

Briller alleges that in 2009 Petroleum Management, LLC obtained a permit and drilled "the deviated SRC #31-5D Well" in the Subject Lands, that Briller was not informed of this, and that even after the well was drilled Synergy "through Holloway and Rasmuson," was contacting Briller about the possibility of drilling deviated wells into the Subject Lands. *Id.* at ¶¶22-34. Briller alleges, on information and belief, that in or before February 2013 "Synergy, and Holloway and Rasmuson" began preparing for a multi-million dollar horizontal multi-well drilling program that would involve drilling into and producing from the Subject Lands. *Id.* at ¶35. In October 2013 Mr. Holloway inquired whether Briller wished to participate in new horizontal wells or to sell its interest but did not reveal their planned drilling program to Briller. *Id.* at ¶37.

Briller alleges, on information and belief, that in April 2014 Synergy entered into a letter agreement with the City of Greeley indicating, among other things, that it would cause the RWL well on the golf course to be plugged and abandoned. *Id.* at ¶38, 43. Briller was not informed of this agreement. *Id.* at ¶44. Also on information and belief in or before June 2014 "Synergy, and Holloway and/or Rasmuson" began preparing to apply to the Colorado Oil and Gas Commission for four 640-acre spacing units for the drilling of one horizontal well in each unit, encompassing the Subject Lands. *Id.* at ¶¶41-42.

In July 2014 Mr. Rasmuson called Briller and indicated that Synergy was continuing to prepare documents for a proposed acquisition of Briller's interests. *Id.* at ¶45. Integrated Petroleum Technologies, Inc., "as agent for Synergy, and/or Holloway and/or Rasmuson," and without notifying Briller, sent letters to the Commission regarding spacing units, noting that Synergy is not the only owner within the proposed units, but that it had notified the remaining owners without receiving any objection. *Id.* at ¶¶46-48. Briller alleges, on information and belief, that the letters were not sent to the owners of the minerals in the Subject Lands. *Id.* at ¶49. Also in July 2014 Synergy applied for three drilling permits. *Id.* at ¶52.

In August 2014 Mr. Rasmuson called Briller and stated that he wished to discuss the acres held by production from the GTC Well, and that Synergy needed Briller's consent to the spacing unit for a planned horizontal well. *Id.* at ¶53. No documents were provided for Briller's consideration. *Id.* at ¶54. On August 8, 2014 Synergy obtained a letter opinion from the law firm Dufford & Brown indicating that the GTC Lease had expired for lack of production in 2013 or earlier. *Id.* at ¶55. Synergy nevertheless submitted seven well evaluations to the Commission that identified the GTC Well as a producing well and RWL Enterprises as the well's operator.

*Id.* at ¶56.  The Commission approved seven applications for a drilling permit submitted by Synergy.  *Id.* at ¶58.

On August 29, 2014 someone at Synergy emailed Briller that Synergy would be drilling eight horizontal wells, and that it would need the signature of Briller (RWL Enterprises) as operator of the Greeley Tech Center 41-5 well on the permit on the Wiedeman 21-5-3NHZ well. *Id.* at ¶59.  Within minutes, however, "Synergy and Rasmuson" sent another email to RWL Enterprises asking that the first email be disregarded.  *Id.* at ¶60.  The well in question was relocated "to further avoid having to disclose the facts alleged above," but RWL and Briller were not so informed.  *Id.* at ¶¶62-64.

Briller alleges, on information and belief, that "either Synergy or Petroleum Management, LLC, an entity controlled by Holloway and Rasmuson and others," is the lessee of oil and gas in the Subject Lands. Township 6 North, Range 66 West, 6th P.M.: Section 32: S½ SE ¼ and will receive a proportionate share of the hydrocarbons produced from the Wiedeman 21-5-3NHZ well, thereby reducing the share of production that would have been received by Briller.  *Id.* at ¶66.  In September 2014 Synergy commenced drilling all wells except the Wiedeman 21-5-3NHZ well, but "Neither Synergy nor Holloway nor Rasmuson notified RWL Enterprises or Briller than the drilling of the horizontal wells had commenced."  *Id.* at ¶68. "Synergy and Rasmuson" also emailed the Dufford & Brown opinion letter to RWL Enterprises, advising that the GTC Lease had expired.  *Id.* at ¶69.  Nevertheless, through November, 2014 "Synergy, and Holloway and Rasmuson continued to periodically discuss with Briller the possibility of acquiring the GTC Well and the GTC Lease from Briller."  *Id.* at ¶71.

Also in November 2014 "IPT, as agent for Synergy, and/or Holloway and/or Rasmuson" sent a letter to the Commission requesting creation of a 400-acre spacing unit for the drilling of the Wiedeman well into the Subject Lands, indicating that other mineral owners had been notified and had not objected. *Id.* at 72. However, neither RWL Enterprises nor Briller was notified. *Id.* at ¶73. Briller alleges, on information and belief, that the mineral owners had not been notified. *Id.* at ¶74. The Commission approved an application to drill the Wiedeman well. *Id.* at ¶¶75-76. On November 11, 2014 Briller learned that at least four of eight planned horizontal wells had already been drilled into the through the Subject Lands. *Id.* at ¶77.

Synergy is the operator of all the wellbore spacing units. *Id.* at ¶¶79-81. On information and belief "Synergy, Holloway, and Rasmuson" obtained valuable geophysical data and removed hydrocarbon-bearing rock from the Subject Lands, which are the sole property of Briller." *Id.* at ¶82-83. On December 9, 2014 "Synergy and Rasmuson" emailed a letter to RWL Enterprises making certain demands. *Id.* at ¶85. On December 19, 2014 Briller demanded that Synergy cease and desist from taking any additional action that would result in additional trespasses on the GTC Lease and conversion of hydrocarbons within the boundaries of the GTC Lease. *Id.* at ¶91.

2. <u>Conclusions</u>.

In the pending motion Mr. Holloway and Mr. Rasmuson argue that the counterclaims against them personally do not state a claim on which relief can be granted. To survive a 12(b)(6) motion to dismiss, the complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Ridge at Red Hawk, L.L.C. v. Schneider,* 493 F.3d 1174, 1177 (10th Cir. 2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). A plausible

claim is a claim that "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). While the Court must accept the well-pleaded allegations of the complaint as true and construe them in the light most favorable to the plaintiff, *Robbins v. Wilkie,* 300 F.3d 1208, 1210 (10th Cir. 2002), purely conclusory allegations are not entitled to be presumed true, *Iqbal,* 556 U.S. at 681.

Briller alleges that Mr. Holloway and Mr. Rasmuson are "owners, directors and/or employees" of both Petroleum Management, LLC and Synergy." ECF No. 37 at ¶11 (again, using the paragraph numbers in the counterclaim section). However, "a corporation is always a separate entity distinct from its officers, directors, or investors." *Leonard v. McMorris,* 63 P.3d 323, 330 (Colo. 2004). The corporate form "permit[s] shareholders to commit limited capital to the corporation with the assurance that they will have no personal liability for the corporation's debts." *Micciche v. Billings,* 727 P.2d 367, 372 (Colo. 1986). "[I]nsulation from individual liability is an inherent purpose of incorporation." *McCallum Family LLC v. Winger,* 221 P.3d 69, 74(Colo. App. 2009).

The corporate veil may be pierced if the corporate form is used by corporate principals so improperly that continued recognition of the corporation as a separate entity would be unfair. *Id.* at 372-73. There is a three-part inquiry, all prongs of which must be satisfied. *Id.* at 74. First, the court determines whether the corporation is merely an alter ego of the persons in issue. *Id.* In doing so the court considers such factors as

> (1) whether the corporation is operated as a separate entity, (2) commingling of funds and other assets, (3) failure to maintain adequate corporate records, (4) the nature of the corporation's ownership and control, (5) absence of corporate assets and undercapitalization, (6) use of the corporation as a mere shell, (7) disregard of legal formalities, and (8) diversion of the corporation's funds or assets to noncorporate uses.

11

*Leonard,* 63 P.3d at 330 (quoting *Newport Steel Corp. v. Thompson,* 757 F. Supp. 1152, 1157 (D. Colo. 1990).

Second, "the court must determine whether justice requires recognizing the substance of the relationship between the person or entity sought to be held liable and the corporation over the form because the corporate fiction was 'used to perpetrate a fraud or defeat a rightful claim.'" *McCallum,* 221 P.3d at 74. "Only when the corporate form was used to shield a dominant shareholder's improprieties may the veil be pierced." *In re Phillips,* 139 P.3d 639, 644 (Colo. 2006).

Third, "the court must consider whether an equitable result will be achieved by disregarding the corporate form and holding a shareholder or other insider personally liable for the acts of the business entity." *McCallum,* 221 P.3d at 74.

Similarly, "to hold members of a limited liability company personally liable for the alleged improper actions of the limited liability company, the court shall apply the case law which interprets the conditions and circumstances under which the corporate veil of a corporation may be pierced under Colorado law." C.R.S. § 7-80-197(1)

Here, however, Briller has not applied the tests that Colorado courts have traditionally used to determine whether the corporate veil should be pierced. Mr. Holloway and Mr. Rasmuson argue that this requires dismissal of the claims against them. Briller responds that Mr. Holloway and Mr. Rasmuson may be held liable personally without piercing the corporate veil because they actively participated in the commission of the common law torts of trespass and conversion and the statutory tort of civil theft. I am not convinced.

To begin, I have noted above in summarizing the counterclaims that Briller repeatedly alleges that "Synergy, and Holloway, and Rasmuson" did something, or that Synergy "through Holloway and Rasmuson" did something, or similar wordings. That pleading convention could be used in any suit against a corporation or an LLC. A corporation can only act through its officers and employees. *See, e.g., Lombard v. Colorado Outdoor Education Center,* 266 P.3d 412, 419 (Colo. App. 2011).

In an attempt to distinguish this case from others, Briller relies primarily on a decision of the Colorado Court of Appeals, *Hoang v. Arbess,* 80 P.3d 863 (Colo. App. 2003), *cert. denied,* 2003 WL 22838733 (Colo. Dec. 1, 2003). Hoang and several others purchased homes built by Monterra Homes, LLC. Monterra was a limited liability company whose members were Mr. Arbess and other LLC's. Arbess, who was also Monterra's manager, hired a construction superintendent and sales and support staff, and he used subcontractors to construct plaintiffs' homes. The homes were built on expansive soils. Arbess, who had never built homes in Colorado, hired a soils engineer, who advised him of the dangers of building on expansive soils and recommended specific construction and landscaping techniques to mitigate those risks. But Arbess did not follow the engineer's recommendations. Plaintiffs were told that the homes were constructed to avoid damage from expansive soils, but they were not. Because of Arbess's failure to follow the engineer's recommendations, the homes sustained serious damage from the expansive soils.

The plaintiffs sued Arbess and Monterra Homes, asserting claims of negligence, negligent misrepresentation, negligent nondisclosure, and violation of the Colorado Consumer Protection Act. The trial court directed a verdict in favor of Arbess, finding that the evidence

revealed no circumstances which would deny Arbess the protection of the corporate structure. The court of appeals reversed. First it noted that, under Colorado law, a builder has a duty to use reasonable care and skill in the construction of a home. 80 P.3d at 867. Turning to the question whether that duty could be applied to Arbess, the court stated, "[w]hile an officer of a corporation cannot be held personally liable for a corporation's tort solely by reason of his or her official capacity, an officer may be held personally liable for his or her individual acts of negligence even though committed on behalf of a corporation, which is also held liable." *Id.*

The court then explained the circumstances under which this could occur without piercing the corporate veil as such:

> To be found personally liable to third persons for a tort, the officer of a corporation must have participated in the tort. However, courts vary in their views as to the necessary level of participation. At a minimum, personal liability attaches to a defendant who was directly involved in the conduct through conception or authorization. Other direct involvement, such as active participation or cooperation, specific direction, or sanction of the conduct, also may be sufficient. Whether defendant approved of, directed, actively participated in, or cooperated in the negligent conduct is a question of fact for the jury.

*Id.* at 868 (internal citations omitted).

The court found that there was evidence that Arbess was personally involved in every step of the construction, i.e., that he chose the home sites, oversaw the subcontractors, set policies and procedures for the subcontractors to follow, and visited the construction site at least once a week. There was evidence that Arbess knew that he had a responsibility to identify discrepancies between the construction techniques and the soils engineering recommendations and to instruct the subcontractors to correct the problems, but he did not do so. Contrary to the engineer's recommendations, Arbess did not retain the soils engineering company during the foundation construction, and he elected to construct the garage floors in a manner that violated

the soils engineer's recommendations. The court concluded that "there was sufficient evidence presented that defendant knew or should have known that the homes and their landscaping were constructed improperly." *Id.* at 869. In addition, there was evidence that Arbess personally "approved of, directed, actively participate in, or cooperated" in false representations to prospective buyers. *Id.*

There are a number of facts that distinguish *Hoang* from the present case. The LLC, Monterra Homes, was essentially a one-man operation. There was evidence that Arbess knew that the homes were being built improperly, and that he participated in or approved of false representations to prospective buyers. The victims of his misrepresentations were consumers who presumably were unsophisticated in the science of constructing homes on expansive soils. The circumstances were unique and compelling, and in my view courts should be cautious when asked broadly to apply *Hoang* in other contexts.[3]

The facts here, as alleged by Briller, are markedly different from the circumstances that resulted in the *Hoang* decision. There is no indication that Synergy was a one-man operation or anything close to it. No facts were alleged that plausibly show that Mr. Holloway or Mr. Rasmuson knowingly participated in a trespass, a conversion or a civil theft, or that they knowingly participated in or approved of misrepresentations to Briller. Moreover, Briller is hardly an unsophisticated party in the oil and gas industry.

---

[3] I note that Justice Kourlis dissented from the denial of the writ of certiorari, stating that she would grant as to the following issue: Whether the court of appeals has created a vague, unworkable and unpredictable standard for determining the personal liability of corporate officers by announcing that they may be personally liable if they "cooperate" or are "involved" in the negligent conduct of the corporation, including the conduct of other employees, agents or subcontractors for the corporation. *Id.*

To be sure, Briller has alleged that Synergy (after obtaining a permit) drilled one well into the Subject Lands in 2009, and later (upon information and belief) undertook planning and preparation for a much larger drilling program involving the Subject Lands, all without notifying Briller. ECF No. 37 at 22-37. But what is missing is any plausible allegation that Mr. Holloway or Mr. Rasmuson knew or should have known at the time that these activities would be trespassing on or converting Briller's property.

When it prepared the counterclaim Briller was fully aware of Synergy's position, based initially on its review of Briller's production records at the Colorado Oil and Gas Commission (and later supported by a law firm's legal opinion) that Briller's rights under the 1982 and 1985 leases had expired. Briller alleges no <u>facts</u> from which a reasonable inference can be drawn that Mr. Holloway or Mr. Rasmuson did not have an honest belief that Synergy's actions were permissible when they occurred. The conclusory allegations about their knowledge and intent found in paragraphs 100, 110 and 111 of the counterclaims are not entitled to the presumption of truth.

At bottom, the present case results from a fundamental and as yet unresolved dispute as to whether Briller's leases expired by their terms. Synergy seeks a declaratory judgment resolving that issue. If the Court determines that at least one of Briller's leases has not expired, then Synergy's claim fails. If Synergy has extracted any hydrocarbons contrary Briller's rights, then Briller presumably will be entitled to compensation. If facts are developed that would support Briller's claims of willful trespass, conversion or civil theft, so be it. If facts are developed that would support an individual tort claim against either Mr. Holloway or Mr. Rasmuson, so be it. The Court holds that the factual allegations in the present counterclaim fall

short of stating claims against Mr. Holloway or Mr. Rasmuson individually that are plausible on their face. Accordingly, and because Briller has not attempted to pierce the corporate veil, the motion to dismiss the claims against the two individuals for failure to state a claim must be granted.

## ORDER

1. Defendant's Motion to Dismiss, ECF No. 36, is DENIED.

2. The motion to dismiss filed by Edward Holloway and Craig D. Rasmuson, ECF No. 47, is GRANTED. The counterclaims against those defendants are dismissed without prejudice.

DATED this 10th day of March, 2016.

BY THE COURT:

_____
R. Brooke Jackson
United States District Judge